**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

UNITED STATES OF AMERICA

v.

HERACLIO PEREZ,

               Defendant.

CRIMINAL CASE NO.

1:13-CR-00293-WBH-JFK-1

## REPORT AND RECOMMENDATION

Pending before the court are Defendant Heraclio Perez's motion [Doc. 24] to suppress any and all identification testimony regarding him and the supplemental motion [Doc. 38] to suppress any and all identification testimony regarding Rosa Maria Davilla-Guerra, Defendant's wife.  An evidentiary hearing was held on the motions to suppress on October 17, 2013.  [Doc. 45].[1]  Defendant contends that the out-of-court photographic array identification process in this case was unduly suggestive and that any identifications of Defendant or Davilla-Guerra are unreliable.  [Doc. 49].  The Government contends that the photographic array was not unduly suggestive and that, in any event, the identification of Defendant is reliable.  [Doc. 53].  The Government further contends that Defendant cannot challenge the identification of Davilla-Guerra,

---

[1]Citations to the evidentiary hearing transcript are:  (Tr. at ).

however, that identification is also reliable.  [Doc. 13-15; Tr. at 35].  Defendant argues that he may challenge the introduction of evidence that would be used to prove the charged offenses such as the identification of his wife, Davilla-Guerra.  [Doc. 1-9].[2]

## I.    Facts

Defendant is charged with conspiring with others known and unknown, from at least September 30, 2011, and continuing through October 5, 2011, to possess with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. § 846.  [Doc. 1].  The events which, in part, resulted in that indictment being returned were set forth at the evidentiary hearing held on Defendant's motions to suppress.  [Doc. 45].

On or about October 5, 2011, Drug Enforcement Administration ("DEA") Special Agent Terrence Brown met Confidential Source ("CS")[3] after his arrest for being in possession of five kilograms of cocaine.  (Tr. at 6, 16, 20-21).  On December 5, 2011, Agent Brown and DEA Task Force Officer ("TFO") Larod Freeman met with

---

[2]Defendant also argues that the Government waived objections to his challenge to the identification of Davilla-Guerra because some evidence about that identification procedure was presented at the hearing.  [Doc. 49 at 8].  The court does not agree.  The Government raised an objection in a timely fashion to the supplemental motion to suppress at the evidentiary hearing placing Defendant on notice of the need to establish his right to challenge this identification.  (Tr. at 35).

[3]In order to protect this individual's identity, his name is not provided.  (Tr. at 4-5, 19-20).

2

CS and initially discussed CS's concerns about his safety. (Tr. at 6-7). Next Agent Brown handed CS four photographs and "asked him did he recognize anyone in the photographs."[4] (Tr. at 7-8; Gov't Exs. 1-4). CS reviewed the photographs and stated one of the photographs, exhibit 1, was "Terry." According to the agent, Terry is the individual CS had previously met to arrange transportation of the five kilograms of cocaine found in CS's possession when arrested.[5] (Tr. at 8-10). CS was certain of the identification. (Tr. at 9). CS had previously described Terry as a male of Hispanic descent, approximately five foot eight inches tall and 160 pounds, aged in his late thirties or early forties, and having short black hair wearing a baseball cap.[6] (Tr. at 10-11).

CS also identified a black and white photograph, exhibit 2, of a female, as the lady who had delivered the five kilograms to him. (Tr. at 13). He had not provided a

---

[4]CS did not recall the agent saying anything as he handed the photographs to him one by one. (Tr. at 33).

[5]This color photograph was obtained from Defendant's South Carolina driver's license. (Tr. at 11; Gov't Ex. 1). That driver's license provided that Defendant, a Hispanic male, was forty-six years old (in 2011 based on the date of birth), five foot five inches tall and weighing 164 pounds. (Tr. at 11-12; Gov't Ex. 5).

[6]Although CS could not recall the details of the description that he gave the agents of Terry, at the hearing, he said Terry was about his height of five foot seven inches and that Terry's skin was lighter. (Tr. at 31-32).

3

description of this lady to the agents.[7]  (Tr. at 16).  CS was certain of the identification.

(Tr. at 13).[8]

CS testified that he met the person he knew as Terry on September 30, 2011, at

the McDonalds located on Pleasant Hill Road, in Gwinnett County.  He had previously

spoken to Terry over the telephone to arrange the meeting.[9]  (Tr. at 21-22).  CS, as

arranged, waited for Terry in the restroom, and when a male entered the restroom, CS

approached and asked if he was Terry.  The male responded yes.  (Tr. at 22).  They

engaged in general conversation for about five minutes before moving outside to the

parking lot.  The men were face to face within touching distance.  (Tr. at 22-23).  They

spoke outside for approximately fifteen minutes about the price of the cocaine and CS's

payment for transporting the cocaine.  Again, they were within touching distance.

---

[7]At the hearing, CS stated that the lady had light skin tone and her hair had a little blond color.  She was Hispanic.  (Tr. at 32).

[8]The other two exhibits are black and white photographs of Hispanic males.  The photograph identified as exhibit number 3 is Choco (Richard Beltran).  CS did not identify him, but the agent understood that CS had only communicated with Choco on the telephone and never met him in person.  The photograph identified as exhibit number 4 is Jose Espinoza, whom the agent understood CS had never personally met.  CS did not identify that photograph.  (Tr. at 14-15; Gov't Exs. 3, 4).

[9]Although CS may have initially indicated that he met Terry in person more than once, September 30 was the only time the men met.  (Tr. at 10, 17, 29-30).

Terry wore a baseball hat but no sunglasses.  (Tr. at 23-24, 31).  The day was sunny, and CS memorized Terry's face, making eye contact, in order to determine if Terry was being truthful.  (Tr. at 24-25).  No cocaine was transferred that day.  (Tr. at 25).

After the meeting, Terry contacted CS by telephone to make arrangements for CS to take delivery of the cocaine.  Terry advised that CS would meet a lady, in a F-150 truck, at the WalMart.  (Tr. at 25).  On or about October 5, 2011, CS observed the F-150 arrive and park next to him at the WalMart.  A lady was in the passenger seat.[10] (Tr. at 25-26).  The lady opened the door of the truck and handed the package of cocaine to CS.  CS could clearly see her face.  He was not sure how long the meeting lasted but it was short.  (Tr. at 26-27, 32).

CS stated that he examined the photographs presented to him by the agents.  He recognized "Terry and that lady" that gave him the cocaine.  (Tr. at 27).  He stated that he had no problem remembering and that his recollection was "really fresh that I could remember the faces . . . ."  (Tr. at 28).  CS, after his arrest with the cocaine, began cooperating with the hope of receiving a reduced sentence.  (Tr. at 28-19).

Additional facts will be set forth as necessary during the discussion of Defendant's motions to suppress.

---

[10]CS did not get a good look at the face of the male driving the truck.  (Tr. at 26).

5

## II.      Discussion

Defendant contends that the photographic array, due in part to the fact that only his photograph [Gov't Ex. 1] was in color, as compared to the black and white photographs of the other two Hispanic males [Gov't Exs. 3, 4], was unduly suggestive and that the out-of-court identification was and any subsequent in court identification would be unreliable. [Doc. 49 at 6-7 & n.3]. Defendant further contends that the out-of-court identification of his wife, Davilla-Guerra, the only female in the photographic array [Gov't Ex. 2], is not admissible because that array was unduly suggestive and the identification was unreliable.[11] [Doc. 49 at 7-10].

### a.      Identification of Davilla-Guerra

Defendant seeks to suppress testimony about the out-of-court identification of Davilla-Guerra, the lady identified by CS as the person who delivered the five kilograms of cocaine. [Doc. 38]. Defendant, offering no legal authority in support, contends that he has standing to challenge this evidence because the evidence is relevant only for the purpose of bolstering CS's identification of Defendant and because the evidence, identification of his wife as delivering the cocaine, will be

---

[11]Due to the fact that Davilla-Guerra is not a defendant, there will quite likely not be an in-court identification.

6

introduced to prove Defendant's involvement in the conspiracy.  [Doc. 49 at 8].  The Government, likewise offering no legal authority, opposes the motion to suppress asserting that Defendant cannot establish standing because the identification of a non-defendant does not implicate the concerns sought to be protected by providing for the exclusion of an unreliable identification of Defendant.  [Doc. 53 at 13].  For the following reasons, the court finds Defendant's arguments unpersuasive and finds the decision of the district court in United States v. Jones, 652 F. Supp. 1561 (S.D. N.Y. 1986), on this issue persuasive.

In Jones, the defendant sought to suppress evidence of the identification of his co-conspirators claiming that "he has 'standing' to seek suppression of any identification made of them because evidence concerning those identifications will be admissible against him at trial in connection with the conspiracy charge.  He claim[ed] that he [sought] only to assert his own due process right to be protected from admission against him of evidence so unreliable that it deprives him of a fair trial."  Id. at 1572.  The court rejected this argument reasoning that, "if sound, [it] would vest every participant in an alleged conspiracy with vicarious standing to assert any other participant's Fifth Amendment right to a 'reliable' identification *of that other participant*, even where . . . that other participant makes no constitutional claim of [his

7

or] her own." Id. (emphasis in original).  Finding no case supporting the defendant's argument, the court noted that the "trend of appellate authority is against the vicarious assertion of a co-defendant's constitutional rights[.]"  Id. (citation omitted); accord Commonwealth v. Parker, 409 S.W.3d 350, 354-55 (Ky. 2013) (Cunningham, J., concurring in result only) (finding that the majority should have initially resolved the issue of standing, the judge rejected the defendant's challenge to identification evidence pertaining to a co-defendant, found the situation was analogous to cases in which a defendant attempts, but is not allowed, to assert the Fourth Amendment rights of a third party and held there was "no reason to apply a different rule to out-of-court identifications") (citing, *inter alia*, State v. Wilkins, 749 S.W.2d 753, 755 (Tenn. Crim. App. 1988); Burton v. State, 442 S.W.2d 354, 359 (Tex. Crim. App. 1969)).  The Eleventh Circuit Court of Appeals enforces restrictions against defendants asserting vicariously the constitutional rights of others.

In order to challenge the introduction of evidence allegedly obtained in violation of the Fourth Amendment, a defendant must establish that he "maintains a legitimate expectation of privacy in the object of the search."  United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989); and see United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000) (defendant bears the burden of establishing a legitimate

expectation of privacy).  In this regard, "[t]he Supreme Court has held that '[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" United States v. Brown, 743 F.2d 1505, 1506 (11th Cir. 1984) (quoting Rakas v. Illinois, 99 S. Ct. 421, 425 (1978)).  "Fourth Amendment rights are personal and may not be vicariously asserted." Lenz v. Winburn, 51 F.3d 1540, 1549 (11th Cir. 1995).  Defendant Perez's argument that his rights will be "aggrieved" due to introduction of the evidence of Davilla-Guerra's identification, accordingly, is simply insufficient.  Likewise, a defendant may not assert the violation of another person's Fifth Amendment or Sixth Amendment rights to remain silent and to counsel on the grounds that evidence obtained thereby will be used against him at trial.  See United States v. Sims, 845 F.2d 1564, 1568 (11th Cir. 1988) ("Even if the agents' actions violated [co-defendant's] right to counsel, Sims has no standing to assert this claim.  This circuit has held that defendants do not have standing to assert in their own defense the denial of constitutional rights to others. . . .  Sims cannot benefit from alleged constitutional violations personal to [his co-defendant]."); United States v. Fredericks, 586 F.2d 470, 480-81 (5th Cir. 1978) (a co-defendant may not seek "to suppress evidence incriminating him that was obtained from a

coparticipant in crime without proper compliance with the procedural requirements of Miranda or otherwise in violation of that party's Fifth or Sixth Amendment rights").[12]

The court reaches the same conclusion with respect to Defendant's argument that he is only asserting *his* due process right to a fair trial. In an analogous situation involving a motion to dismiss on due process grounds, a defendant cannot rely on allegedly outrageous government misconduct involving or directed at third parties to support his motion. In United States v. Noriega, 117 F.3d 1206 (11th Cir. 1997), the defendant sought dismissal of the indictment based on the manner by which he was brought before the court, which in that case involved a military invasion of Panama. In support of his motion, the defendant relied on the alleged mistreatment and harm to Panamanian civilians during the military action. Rejecting the defendant's reliance on potential or even proven harm to third parties, the Eleventh Circuit Court of Appeals held:

> Further, whatever harm Panamanian civilians suffered during the armed conflict that preceded Noriega's arrest cannot support a due process claim in this case. See United States v. Payner, [100 S. Ct. 2439, 2447 n.9] (1980) (holding that even where government's conduct toward third parties "was so outrageous as to offend fundamental canons of decency

---

[12]Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

and fairness, the fact remains that [t]he limitations of the Due Process Clause . . . come into play only when the Government activity in question violates some protected right of the *defendant*").

Id. at 1214 (emphasis in original).

Additionally, this court's conclusion, like that of the court in Jones, is "enforced . . . by the fact that identification of [Davilla-Guerra] furnishes no direct evidence against [Defendant Perez].   [That] identification[ ] become[s] inculpatory of [Defendant] only if the Government, by other evidence, shows that [Defendant] and . . . [Davilla-Guerra] participated together in a common scheme." Jones, 652 F. Supp. at 1572-73.  For these reasons, the court finds that Defendant cannot seek to suppress testimony about identification of Davilla-Guerra and recommends that the Defendant's supplemental motion [Doc. 38] to suppress be denied.

**b.   Identification of Defendant Perez**

"To violate due process, an identification procedure used by the police must be unnecessarily suggestive and create a substantial risk of misidentification." Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987) (citing Neil v. Biggers, 93 S. Ct. 375, 380-81 (1972)).  "Determining whether an identification is so unreliable as to violate due process requires [the court] to answer two (2) questions:  (1) whether the original identification procedure was unduly suggestive; and if so, (2) whether the procedure,

11

given the totality of the circumstances, created a substantial risk of misidentification at trial." Marsden v. Moore, 847 F.2d 1536, 1545 (11th Cir. 1988); see also United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001) ("This court employs a two-step analysis in assessing the constitutionality of a trial court's decision to admit an out-of-court identification. . . . First, we must determine whether the original identification procedure was unduly suggestive. If we conclude that it was suggestive, we then must consider whether, under the totality of the circumstances, the identification was nonetheless reliable.") (citation omitted). If the identification procedure is not unduly suggestive, "that ends the inquiry." Williams v. Weldon, 826 F.2d 1018, 1021 (11th Cir. 1987).

If it is, the court must determine whether "the identification was nonetheless reliable." Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988). "This second stage involves consideration of five factors identified by the Supreme Court in Neil v. Biggers: opportunity to view, degree of attention, accuracy of the description, level of certainty, and length of time between the crime and the identification." Id. (citing Biggers, 93 S. Ct. at 382). "Under this analysis, 'reliability is the linchpin in determining the admissibility of identification testimony.'" Williams, 826 F.2d at 1021 (quoting Manson v. Brathwaite, 97 S. Ct. 2243, 2253 (1977)). Defendant bears "the

burden of proof on a challenge of the admissibility of identification testimony." United States v. Johnson, 114 F.3d 435, 441 (4th Cir. 1997); see also United States v. Washington, 714 F.3d 962, 966 (6th Cir. 2013); United States v. Daily, 488 F.3d 796, 803 (8th Cir. 2007); United States v. Garcon, 2008 WL 420041, at *9 (S.D. Fla. February 13, 2008).

Defendant contests both the admission of out-of-court and in-court identifications. The same two-step process is used for determining the admissibility of both out-of-court and in-court identifications. In deciding whether to admit an in-court identification, as noted by the Fourth Circuit Court of Appeals, the Supreme Court has stated "that an eyewitness identification at trial following a pretrial identification by photograph should only be suppressed when the photographic identification procedure is so impermissibly suggestive as to give rise to the very substantial likelihood of misidentification." Johnson, 114 F.3d at 441 (citing Simmons v. United States, 88 S. Ct. 967, 971 (1968)). "An in-court identification is admissible even after an improper out-of-court procedure[,] if the in-court identification is itself reliable." United States v. Mattox, 166 F.3d 335, 1998 WL 808362, at *3 (4th Cir. November 23, 1998). Unless a court finds that there is a very substantial likelihood of irreparable misidentification, "arguments about the accuracy of the identification [go] to the weight of the testimony,

13

not its admissibility." <u>United States v. Walls</u>, 237 Fed. Appx. 599, 602 (11th Cir. 2007)

(citing <u>Manson</u>, 97 S. Ct. at 2254).  As the Supreme Court explained, "under our

adversary system of justice, cross-examination has always been considered a most

effective way to ascertain truth."  <u>Watkins v. Sowders</u>, 101 S. Ct. 654, 659 (1981).

As noted, Defendant contends that the photographic array, due to differences in

the appearances of the Hispanic males depicted in the photographs and the fact that

only Defendant's photograph was in color, was unduly suggestive.  [Doc. 49 at 6-7 &

n.3].  When evaluating the suggestiveness of a photographic array, the court should

consider the size of the array, the manner in which the array is presented, and the details

of the photographs.  <u>See</u> <u>United States v. Smith</u>, 156 F.3d 1046, 1050 (10th Cir. 1998).

The size of the array impacts the weight to be given other alleged problems with the

identification procedure.  <u>Id.</u>  With respect to the details of the photographs, the district

court in <u>Cikora v. Wainwright</u>, 661 F. Supp. 813 (S.D. Fla. 1987), stated:

> It is not necessary that all "very similar" individuals be used in a line-up.
> "Participants in lineups are obviously going to differ in facial
> characteristics, and it would be unduly burdensome to require police
> officials to find five or six very similar individuals for a lineup." . . . The
> crucial test of suggestiveness is not dissimilarity of subjects from the
> suspect or from the description of the suspect given to the police, but
> rather whether it can be said that the picture selected would *inevitably*
> have been selected whether or not the individual pictured was guilty or
> innocent. . . .

14

Id. at 819 (citations omitted) (emphasis in original).  This court examined the original photographic array.  [Gov't Exs. 1-4].  Although Defendant focuses on the differences in the appearance of the males depicted in the photographs, the court finds that the real problem with the photographic array, besides the fact only three photographs of males were included, is that Defendant's photograph is the only one in color.

In O'Brien v. Wainwright, 738 F.2d 1139 (11th Cir. 1984), a case in which the defendant's photograph was the only one in color, the Eleventh Circuit Court of Appeals stated, "A photographic lineup similar to the one in this case was held impermissibly suggestive . . ." by the Former Fifth Circuit Court of Appeals.  Id. at 1141 (citing Passman v. Blackburn, 652 F.2d 559, 570 (5th Cir. 1981)).  The court in O'Brien likewise found the lineup in that case unduly suggestive.  And see United States v. Crozier, 259 F.3d 503, 510-11 (6th Cir. 2001) (finding that including a single color photograph, that of the defendant, in an array of black and white photographs was unduly suggestive).  The photographic array in this case is not simply a situation where Defendant's photograph stands out from the other two photographs.  See United States v. Smith, 148 Fed. Appx. 867, 874 (11th Cir. 2005) ("A lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from the others.").

15

Instead, the court finds that Defendant Perez's photograph sticks "out like a 'sore thumb.'" O'Brien, 738 F.2d at 1141 (citation omitted).

Although no other factors indicate that the photographic array procedure was unduly suggestive, the court finds, due to the facts that only three photographs were shown to CS and, of those three, only Defendant's photograph was in color, that the identification procedure was unduly suggestive.   However, even though the photographic array was unduly suggestive, "given the totality of the circumstances," the court does not find that the array "created a substantial risk of misidentification at trial."   Marsden, 847 F.2d at 1545.   Applying the factors set forth in Biggers, opportunity to view, degree of attention, accuracy of the description, level of certainty, and length of time between the crime and the identification, 93 S. Ct. at 382, the court finds that the identification by CS is reasonably reliable and that any inconsistencies and uncertainty in the out-of-court identification, or for that matter subsequent in-court identification, are properly "'grist for the jury mill.'"   O'Brien, 738 F.2d at 1143 (citation omitted).

The first and second factors, CS's opportunity to view Defendant Perez and degree of attention to Defendant's face, weigh heavily in favor of finding that the identification is reliable.   CS testified that he met the person he knew as Terry on

16

September 30, 2011, at the McDonalds located on Pleasant Hill Road, in Gwinnett County. He had previously spoken to Terry over the telephone to arrange the meeting. (Tr. at 21-22). CS, as arranged, waited for Terry in the restroom, and when a male entered the restroom, CS approached and asked if he was Terry. After the male responded yes, they engaged in general conversation for about five minutes before moving outside to the parking lot. The men were face to face within touching distance. (Tr. at 22-23). They spoke outside for approximately fifteen minutes about the price of the cocaine and CS's payment for transporting the cocaine. Again, they were within touching distance. Terry wore a baseball hat but no sunglasses. (Tr. at 23-24, 31). The day was sunny, and CS memorized Terry's face, making eye contact, in order to determine if Terry was being truthful. (Tr. at 24-25). This period of time, the circumstances surrounding the meeting, and CS's degree of attention are sufficient to find the identification reliable. See O'Brien, 738 F.2d at 1141 (victim only observed the defendant for a matter of seconds but focused his attention on the defendant's actions). Likewise, CS is certain of his identification of Terry as the man that he met with on September 30, 2011. (Tr. at 9, 27). As CS testified, he recognized "Terry and that lady" that gave him the cocaine. (Tr. at 27). He stated that he had no problem

17

remembering and that his recollection was "really fresh that I could remember the faces . . . ." (Tr. at 28).  This factor also weighs in favor of finding the identification reliable.

CS provided a reasonably accurate description of Terry to the agents.  CS advised Agent Brown that Terry, a Hispanic male in his late thirties to early forties, was approximately five foot eight inches, weighing about 160 pounds, with short black hair. (Tr. at 10-11).  The information on Defendant's driver's license indicates that he was 46 years old in 2011, was five foot five inches tall and weighed 164 pounds.[13]  (Tr. at 11-12; Gov't Ex. 5).   No other evidence was presented at the hearing regarding Defendant's actual height and weight in the fall of 2011.  In any event, the court finds CS's pre-identification description of Terry of sufficient detail and accuracy, including being close to Defendant's age, height and weight, as well as accurately identifying national origin, to support finding the subsequent identification reliable.  See Manson, 97 S. Ct. at 2254 ("Short of [finding a substantial likelihood of irreparable misidentification], such evidence is for the jury to weigh.  We are content to rely upon

---

[13]The reliability of the information on the driver's license depends on Defendant's accuracy in providing the information on renewal, which appeared to be in May 2007. (Gov't Ex. 5).  CS, who is five foot seven inches, also testified on cross-examination that he recalled Defendant being approximately the same height.  (Tr. at 31-32).

AO 72A
(Rev.8/82)

the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill.").

And, finally, the time delay between CS's meeting with Terry, on September 30, 2011, and the out-of-court identification, on December 5, 2011, was not unduly long. The Eleventh Circuit Court of Appeals has declined to find that periods of time from two months to six years between commission of the crime and the identification mandates exclusion of identification evidence.  See United States v. Jean, 315 Fed. Appx. 907, 913 (11th Cir. 2009) (six years); United States v. Douglas, 489 F.3d 1117, 1127 (11th Cir. 2007) (eight months); United States v. Burke, 738 F.2d 1225, 1229 (11th Cir. 1984) (although line-up was suggestive, court found identification reliable because the witness was in the defendant's "presence long enough for her to closely observe him[,]" because she "paid attention to [him] because he was one of the few customers" present, and because only "two months elapsed between the first meeting and the" identification).  As true with other factors impacting the reliability of the identification evidence, the evidence concerning the approximately two month time period is subject to cross-examination and weighing by the jury.  See Jean, 315 Fed. Appx. at 913.

Based on the totality of the circumstances, the court finds that despite the impermissibly suggestive photographic array, the out-of-court identification is not and

19

any in-court identification of Defendant by CS will not be impermissibly unreliable. See Crozier, 259 F.3d at 511-12 (although use of color photograph of the defendant was unduly suggestive, applying the Biggers factors, the court found the identification reliable); O'Brien, 738 F.2d at 1141-43 (same).  The court also notes that cases involving circumstances giving rise to a much greater chance of misidentification than the facts in this case would support have not resulted in exclusion of the in-court identification.  In United States v. Montgomery, 150 F.3d 983 (9th Cir. 1998) (as amended), the Ninth Circuit Court of Appeals found that, although pretrial identification procedures were unnecessarily suggestive, the in-court identification was sufficiently reliable.  In that case, an employee of a chemical supply company, who sold one quantity of chemicals to defendant, was shown photographs of the three targets of the investigation approximately one year later, and he identified the photograph of defendant as the individual who bought the chemicals.  Id. at 991-93.  A few weeks prior to trial, at the witness' request, an agent faxed the witness a photograph of the defendant in order for the witness to "'have it right in [his] mind that [he] could identify Montgomery.'"  Id. at 992 (no citation provided).  And, the day before the witness was scheduled to testify at trial, escorted by an agent, the witness entered the courtroom to observe defendant seated at the defense table "so that he could 'have it straight in my

20

mind that Montgomery was the fellow that had purchased the chemicals from us. . . .'"
Id. (no citation provided). Despite this conduct, which the court found "emphasized the focus of the investigation on Montgomery as the person who purchased the [chemicals,]" the court held that under the totality of the circumstances, the in-court identification by the witness was sufficiently reliable.[14] Id. at 992-93.

In Smith, 156 F.3d 1046, the Tenth Circuit Court of Appeals found that testimony of both out-of-court and in-court identifications were sufficiently reliable to overcome unduly suggestive identification procedures. The defendant robbed a sporting goods store by stealing a firearm he was pretending to purchase. One witness, Dotson, was the clerk who assisted the defendant in the store. Another employee witness, Cunico, observed the defendant in the parking lot through the windshield of the vehicle used to flee the scene.[15] Id. at 1048. As part of the investigation, the agent obtained eight photographs of individuals, including defendant Smith, from the yearbook at a nearby high school. Written on some of the photographs, including the

---

[14]These circumstances included the facts that this witness only observed the defendant approximately a year before any identification on one occasion while the defendant purchased a quantity of chemicals. And the witness found it necessary to request a photograph of and to view the defendant to be sure of his identification.

[15]The store employees discussed among themselves their observations and eventually agreed upon a description of the robber. Id. at 1048.

one depicting Smith, was the individual's name.  The photographs were shown in a loose fashion to witnesses.  Id.  The second witnessto review the photographs, Cunico, attended high school with Smith and recognized him from high school, as well as identifying him as being the robber.  As each witness identified a photograph, he or she was asked to sign and date the reverse side.  Cunico did so.  A few days later, the agent advised Cunico that he had picked the photograph of the suspect.  Id. at 1049.  A week after the robbery, Dotson was shown the photographs.  On the night of the robbery, Dotson had advised police that he could not recognize anyone.  When shown the photographs, he advised the agent that he could not recognize anyone.  Id.  The agent asked Dotson to take his time and look at the photographs; then, he left Dotson alone in the room with the loose photographs, including Smith's which bore the signatures on the reverse of each witness who had identified him as the robber.  Id.  Dotson selected the photograph of Smith, and the agent advised him "that everyone else had picked the picture of Mr. Smith also."  Id.  After applying the Biggers factors[16] to each identification and weighing those factors against the "corruptive effect" of the pretrial

---

[16]Again, each of these witnesses observed the defendant for a brief period of time on one occasion.

22

identification procedures, the court found that there was not a very substantial likelihood of misidentification.  Id. at 1051-52.

Accordingly, although the court finds that the photographic array was unduly suggestive, the court does not find the out-of-court identification or, based on the evidence presently in the record, any subsequent in-court identifications present "a very substantial likelihood of irreparable misidentification."  Simmons, 88 S. Ct. at 971. Based on the totality of the circumstances and consideration of the Biggers factors which weigh in favor of the reliability of the identification, the evidence before the court does not support excluding the evidence from trial.  For these reasons, the court recommends denying Defendant's motion [Doc. 24] to suppress his identification.

## III.    Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** denying Defendant's motions [Docs. 24 and 38] to suppress identification evidence.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

23

**SO RECOMMENDED AND ORDERED** this 24th day of January, 2014.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

24